**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM SCHAFFHOUSER,**<br><br>Plaintiff,<br><br>*v.*<br><br>**TRANSEDGE TRUCK CENTERS, et al.,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 19-5811-KSM** |

**MEMORANDUM**

**Marston, J.** **June 2, 2020**

Plaintiff William Schaffhouser brings claims against his former employer, Defendant Transedge Truck Centers, for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED"). (Doc. No. 1 at pp. 9-13.) Schaffhouser also asserts a claim against his former supervisor, Defendant John Martin, for IIED. (*Id.* at p. 13.) Transedge and Martin move to dismiss the IIED and NIED claims (Counts II, III, and IV of the Complaint), arguing that they are barred by the Pennsylvania Workers' Compensation Act—which provides the exclusive remedy for work-related injuries—and do not fall within the Act's narrow exception. (Doc. No. 6.) Transedge and Martin also contend that Schaffhouser fails to allege conduct that is sufficiently extreme or outrageous to state an IIED claim. (*Id.*) For the reasons discussed below, the Court grants the Motion.

**I. BACKGROUND**

Accepting all of Plaintiff's allegations as true, the relevant facts are as follows. On

March 18, 2019, Transedge hired Schaffhouser as a salesperson, and in his new role, Schaffhouser reported to Martin, a sales manager. (Doc. No. 1 at ¶¶ 11–14, 17.) On Schaffhouser's second day of work, Martin summoned Schaffhouser into his office by stating, "Helen Keller, come in here." (*Id.* at ¶ 14.) Schaffhouser estimates that, during the course of his tenure at the company, Martin called him "Helen Keller" on fifteen occasions. (*Id.* at ¶ 15.) Additionally, Martin would beckon Schaffhouser "by slapping his thigh, as if calling for a dog to come, and saying 'come here, come here.'" (*Id.* at ¶ 16.) Schaffhouser also alleges that on one particular day, Martin stopped by his office five separate times to complain that he had a single sheet of wrinkled paper on his desk. (*Id.* at ¶ 22.)

Although Martin was Schaffhouser's direct supervisor and responsible for providing Schaffhouser with instruction and advice, Martin routinely refused to respond to Schaffhouser's work-related questions or requests. (*Id.* at ¶¶ 17–19.) On multiple occasions, Martin refused to acknowledge Schaffhouser's presence when Schaffhouser came to his office. (*Id.* at ¶ 19.) Schaffhouser alleges that "[t]his inability to communicate with [his] direct supervisor" made it "nearly impossible" for him to properly perform his job. (*Id.* at ¶ 20.)

Further, when Martin did speak to Schaffhouser, he either mocked Schaffhouser or complained about and mocked their co-workers. (*Id.* at ¶¶ 21, 23.) For instance, Martin referred to a general manager named Jeff as a "worthless piece of shit"; referred to Karen in Human Resources as a "no good, worthless piece of shit"; referred to a leasing department manager named Garrett as a "piece of shit"; and referred to a group of female employees as "estrogen row" and claimed that one of them sold "vibrators" for a living. (*Id.* at ¶ 24.) Martin told Schaffhouser that he had "been in trouble so many times and there's nothing anyone could do about it." (*Id.* at ¶ 25.)

In late May 2019, approximately two months after he started working at Transedge, Schaffhouser formally complained about Martin's conduct to a Human Resources representative named Karen. (*Id.* at ¶¶ 26–27.) Karen told Schaffhouser that several other employees had also complained about Martin's abusive conduct. (*Id.* at ¶ 28.) She said, "We've talked to him many times. We're going to handle this." (*Id.*) Karen also told Schaffhouser that he did not look well, and he should go home and rest. (*Id.* at ¶ 29.)

Schaffhouser had a history of suffering from a heart condition called Atrial Fibrillation ("AFib"), which he successfully managed with medication. (*Id.* at ¶¶ 13, 30.) Schaffhouser alleges that he later learned that the stress he experienced from working with Martin had caused him to go into AFib that day. (*Id.* at ¶ 30.)

When Schaffhouser returned to work the next day, Transedge's Vice President, Scott Kress, asked him why he reported Martin to Human Resources. (*Id.* at ¶ 31.) Schaffhouser described Martin's conduct to Kress, and Kress replied, "We all know how John is, and you don't have to be afraid of him." (*Id.* at ¶ 32.) Afterwards, Schaffhouser grew worried that no one at Transedge would address Martin's conduct. (*Id.* at ¶ 33.) Schaffhouser then began to feel sick and went to the emergency room for medical treatment. (*Id.*)

The emergency room doctor determined that Schaffhouser had gone into AFib, and prescribed blood thinner and doubled the dosage of Schaffhouser's AFib medication. (*Id.* at ¶¶ 34–35.) Further, after Schaffhouser told the doctor about the "psychological toll" Martin's conduct was having on him, the doctor diagnosed Schaffhouser with anxiety and depression and prescribed him medication. (*Id.* at ¶ 36.) The doctor also instructed Schaffhouser to stay home from work the following day, the Friday before Memorial Day. (*Id.* at ¶ 37.) While Schaffhouser was still in the emergency room, his wife called Karen and informed her that

Schaffhouser had a heart condition. (*Id.* at ¶ 38.)

The day Schaffhouser was slated to return to work, Schaffhouser woke up and immediately felt anxious and experienced chest pain at the prospect of returning to work. (*Id.* at ¶ 39.) Schaffhouser alleges that he returned to work, but felt like he was "again ostracized" because he received "little to no communication" from anyone at Transedge. (*Id.* at ¶ 40.) The next day, Schaffhouser felt worse and went back to the emergency room, where the doctor determined that Schaffhouser was in AFib and raised the possibility of treating Schaffhouser's heart condition with surgical intervention. (*Id.* at ¶¶ 41–42.) The doctor kept Schaffhouser overnight for observation and instructed him not to return to work for the rest of the week. (*Id.* at ¶¶ 42–43.)

When Schaffhouser returned to work on June 3, 2019, he told Karen and Kress that he had been out of work due to his heart condition, which had been worsened by Martin's conduct. (*Id.* at ¶ 45.) Schaffhouser also informed them that his physician had recommended surgical intervention in the near future and that he may need time off from work to recover. (*Id.* at ¶ 46.)

About three weeks later, on June 22, 2019, Kress told Schaffhouser that he was being terminated for a violation of company policy and that Schaffhouser was not physically present in the office enough. (*Id.* at ¶¶ 47–48.)

## II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although we must accept as true the allegations in the complaint, we are not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

## III. DISCUSSION

Transedge and Martin assert that Schaffhouser's IIED and NIED claims are barred by the Pennsylvania Workers' Compensation Act ("WCA"). (Doc. No. 6 at ¶¶ 28–35.) Defendants also argue that Schaffhouser's allegations are not sufficiently extreme or outrageous to support his claims. (*Id.* at ¶¶ 11–27.) We address each argument in turn.

The WCA provides the exclusive remedy for employees' work-related injuries. *See* 77 Pa. Stat. and Cons. Stat. Ann. § 481(a). It is well-settled that the exclusivity provision applies to IIED and NIED claims. *See, e.g.*, *Mikula v. W. Short Window & Door, Inc.*, 18-cv-1341-NR, 2019 WL 5578886, at *9 (W.D. Pa. Oct. 29, 2019); *Dart v. County of Lebanon*, Civ. No. 13-CV-02930, 2014 WL 4792135, at *11 (M.D. Pa. Sept. 23, 2014); *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 436 (E.D. Pa. 2010).

### A. *NIED Claim*

Schaffhouser concedes that his NIED claim (Count III) is barred by the WCA and dismissal is warranted on that claim. (Doc. No. 8 at pp. 7, 11.) Accordingly, we grant dismissal on Count III, the NIED claim, with prejudice.

### B. *IIED Claims – Personal Animus Exception*

Schaffhouser argues that his IIED claims against Transedge and Martin (Counts II and IV) are not preempted by the WCA because they fall within a narrow statutory exception, known as the "personal animus" exception. (*See* Doc. No. 8 at p. 11.) The personal animus exception

allows a plaintiff-employee to recover for injuries caused by "an act of a third person [such as a co-worker] intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment." *See* 77 Pa. Stat and Con. Stat. Ann. § 411(1); *Ahmed v. Lowe's Home Ctrs., Inc.*, 346 F. App'x 816, 821 (3d Cir. 2009); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 160 (3d Cir. 1999).

Courts have varied considerably in how they apply the personal animus exception. *See Jackson v. Lehigh Valley Physicians Grp.*, Civil Action No. 08-3043, 2009 WL 229756, at *7 (E.D. Pa. Jan. 30, 2009) (collecting cases); *Fugarino v. Univ. Servs.*, 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000) (collecting cases). *Compare Medley v. SugarHouse HSP Gaming, L.P.*, Civil Action No. 12-cv-6284, 2013 WL 1157349, at *6–7 (E.D. Pa. Mar. 21, 2013) (applying the personal animus exception where the plaintiff alleged her immediate supervisor made "harassing and degrading personal comments," used "profane and abusive language," and "threat[ened] to terminate [the plaintiff's] employment without justification"); *Shad v. Delta Air Lines, Inc.*, Civil Action No. 14-5509, 2015 WL 1808696, at *14 (E.D. Pa. Apr. 20, 2015) (applying the personal animus exception where the plaintiff alleged that "her superior tricked her into resigning"); *Brooks v. Mendoza*, No. CIV.A. 00-5045, 2002 WL 467157, at *1, *4 (E.D. Pa. Mar. 26, 2002) (applying the personal animus exception in a sexual harassment case where the plaintiff alleged that her manager "taunt[ed] [her] with a vibrating object in his pants," "pursu[ed] [her] around the restaurant despite her protests," and "uttered obscene remarks to her") *with Rorrer*, 712 F. Supp. 2d at 437 (finding that the personal animus exception did not apply where the supervisor bothered a number of other women in the workplace, in addition to the plaintiff); *Fugarino*, 123 F. Supp. 2d at 844 (noting, in dicta, that the personal animus exception likely did not apply, where the plaintiff alleged that her supervisor reprimanded and criticized her, searched her desk,

asked her out on a date, and made an obscene work call); *Iacono v. Toll Bros.*, No. CIV.A. 01-4486, 2001 WL 1632138, at *2 (E.D. Pa. Dec. 19, 2001) (holding that the personal animus exception was not applicable where the plaintiff alleged that her supervisor sexually harassed her because "all of the allegedly offensive conduct occurred at work and arose out of the employment relationship").

At bottom, "the critical inquiry in determining the applicability of the [personal animus] exception is whether the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship." *Fugarino*, 123 F. Supp. 2d at 844. "[I]f the third party would have attacked a different person in the same position as the injured employee, that attack falls outside the exception and is covered exclusively by the [WCA]." *Mikula*, 2019 WL 5578886, at *10 (citations omitted).

We find that Schaffhouser failed to adequately plead that Martin's conduct was motivated by "personal animus" towards him. Indeed, Schaffhouser alleges that Martin mocked and complained about his co-workers, including: calling a general manager named Jeff a "worthless piece of shit"; referring to Karen in Human Resources as a "no good, worthless piece of shit"; referring to a leasing department manager named Garrett as a "piece of shit"; and referring to a group of female employees as "estrogen row." (Doc. No. 1 at ¶ 24.) In his opposition brief, Schaffhouser attempts to walk back from any allegations illustrating that Martin also treated others poorly and may have been an equal-opportunity bully, by arguing that he is unaware of whether Martin actually directed any of those statements towards the co-workers themselves. (Doc. No. 8 at p. 12.) But Schaffhouser simply ignores his most telling allegation, which is that when he finally lodged a formal complaint against Martin, Karen in Human Resources informed

him that several other employees had also lodged formal complaints about Martin's abusive conduct and told him, "We've talked to [Martin] many times. We're going to handle this." (*Id.* at ¶ 28.)[1] And, as Defendants correctly observe, Schaffhouser also alleges that "at all material times hereto, Defendant [Transedge] was aware of Defendant Martin's conduct towards Plaintiff *and towards other employees who lodged formal complaints against Defendant Martin*." (*Id.* at ¶¶ 63, 68; *see also* Doc. No. 9 at p. 2.) In light of Schaffhouser's allegations that Martin routinely mocked other employees and that other co-workers similarly complained about Martin's "abusive conduct," we find that Martin's treatment of Schaffhouser was not motivated by purely personal reasons, as opposed to generalized contempt or hatred.

Further, Schaffhouser alleges that Martin ignored him and "refused to respond to any of [his] questions or requests regarding work." (*Id.* at ¶¶ 18–19.) Schaffhouser asserts that "[t]his inability to communicate with a direct supervisor made [] performance of his job nearly impossible." (*Id.* at ¶ 20.) Schaffhouser also alleges that Martin harassed him about trivial matters, such as stopping by his office five times in one day to complain about a single sheet of wrinkled paper on his desk. (*Id.* at ¶¶ 21–22.) Such actions—*i.e.*, failure to adequately communicate with a subordinate and criticizing the orderliness of a subordinate's work space—are inherently work-related and arise within the employment context. Even those acts that are potentially outside of the employment context, such as Martin calling Schaffhouser "Helen Keller" and summoning Schaffhouser by slapping his thigh, were directed at Schaffhouser while he was at work. *See Fugarino*, 123 F. Supp. 3d at 844 ("In this case, it appears that most of [the supervisor's] harassment—reprimands, criticisms, and searching of Plaintiff's desk—clearly was work-related. In addition, even those acts potentially outside the employment context—asking

[1] Schaffhouser's allegation that Martin told him that he had "been in trouble so many times" (*id.* at ¶ 25) only bolsters the allegation that others had formally complained about Martin.

for a date and making an obscene phone call—were directed at Plaintiff while at work. Thus, it appears that the WCA exception would not apply based on the Plaintiff's allegations in the Complaint.").

Because the personal animus exception does not apply,[2] Schaffhouser's IIED claims are barred by the WCA. Accordingly, we grant Defendants' motion to dismiss Counts II and IV.

**C. *IIED Claims – Extreme and Outrageous Conduct***

In any event, even if Schaffhouser's IIED claims fell within the ambit of the personal animus exception, those claims would still fail because the facts alleged are insufficient to show that Martin's conduct was extreme and outrageous. "To state a claim for IIED, a plaintiff must show extreme and outrageous conduct that is deliberate or reckless and causes severe emotional distress." *Fugarino*, 123 F. Supp. 2d at 844 (citations omitted). The Pennsylvania Supreme Court has characterized IIED as a "most limited" tort. *See Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998). Indeed, a plaintiff may recover for IIED only where the alleged conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Dart*, 2014 WL 47929135, at *11 (internal quotation marks and citations omitted); *see also Reedy v. Evanson*,

[2] If Schaffhouser's claims did fall within the personal animus exception, as Schaffhouser argues, that would undermine his ability to bring an IIED claim against Transedge on the theory of vicarious liability. *See Medley*, 2013 WL 1157349, at *7; Doc. No. 1 at pp. 11–12. "In Pennsylvania, an employer may be held liable for the torts of its servants only if that conduct falls within the servant's scope of employment. This applies to intentional conduct as well as negligent conduct . . . Furthermore, if the act is done for personal reason, or in an outrageous manner, it is not done within the scope of employment." *Medley*, 2013 WL 1157349, at *7 (internal quotation marks and citations omitted). In *Medley*, the court granted the defendants' motion to dismiss, finding that the defendant–employer was not vicariously liable on the IIED claim because the plaintiff alleged that her supervisor's acts were motivated by personal animus. *Id.* The court explained: "[T]he very argument [the supervisor's] conduct was spurred by personal animus dissolves [the plaintiff's] argument of respondeat superior. *If, as [the plaintiff] argues, [the supervisor's] actions were motivated by personal animus toward her, it follows that such conduct falls outside the scope of [the supervisor's] employment*." *Id.* (emphasis added). The same logic holds true here. Thus, although we hold that the personal animus exception is inapplicable here, we note that if it were to apply, we would still dismiss the IIED claim brought against Transedge on vicarious liability grounds, since Martin's allegedly abusive conduct towards Schaffhouser would necessarily fall outside of the scope of his employment with Transedge.

615 F.3d 197, 231–32 (3d Cir. 2010); *Fugarino*, 123 F. Supp. 2d at 844. Courts in this Circuit regularly note that "'it is extremely rare to find conduct in the employment context that will give rise to the level of outrageousness necessary to provide a basis for recovery of [IIED].'" *See, e.g.*, *Mikula*, 2019 WL 5578886, at *10 (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988)); *Dart*, 2014 WL 4792135, at *11; *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 361 (M.D. Pa. 2012); *Furgarino*, 123 F. Supp. 2d at 844.

To be sure, the bar to show IIED is high. Conduct may rightly be characterized as bullying, abusive, improper, and highly offensive and yet still not be extreme or outrageous enough to allow for recovery on an IIED claim. In *Dart v. County of Lebanon*, the plaintiff alleged that one of the defendants "made demeaning comments regarding her work performance, including statements that 'a blind person could do better than you' and questioning whether Plaintiff 'want[ed] to sign [her] resignation now.'" 2014 WL 4792135, at *11. The court held that such conduct, "while possibly constituting bullying and abuse, could not be considered so 'extreme and outrageous' as to meet the high threshold to support an [IIED] claim," and granted the defendants' motion to dismiss. *Id.* In *Fugarino v. University Services*, the plaintiff alleged that her immediate supervisor criticized her, publicly reprimanded her, disparaged her professionally and personally to others, searched her desk at work, asked her out on a date twice, and made an obscene phone call to her at work. 123 F. Supp. 2d at 844. The court granted the defendants' motion to dismiss, concluding that "[b]oorish and improper as this behavior may be, it simply does not rise to the level of outrageousness or atrocity necessary to state an IIED claim." *Id.* at 844–45. *Accord Hoy*, 720 A.2d at 755 (finding the plaintiff could not recover on IIED claim, where the record established "highly offensive and unacceptable" sexual harassment, including sexual propositions, "physical contact with the back of [the plaintiff's]

knee," "the telling of off-color jokes and the use of profanity on a regular basis," and "the posting of a sexually suggestive picture"); *see also Harper v. Misitano*, No. 1:15-cv-2205, 2016 WL 4429941, at *1, *3 (M.D. Pa. Aug. 22, 2016) (granting motion to dismiss IIED claim where the plaintiff alleged multiple instances of sexual harassment, such as hugging, touching, using suggestive language, and attempting to hand-feed her, and alleged that her supervisor threatened to demote her and repeatedly told her it was "stupid" to complain to Human Resources).

Here, Schaffhouser alleged that, during the approximately three months he worked for Transedge, Martin repeatedly mocked him; repeatedly called him Helen Keller; beckoned him by slapping his thigh; criticized him for having a single sheet of wrinkled paper on his desk; ignored him and refused to respond to his questions or concerns regarding work; and that such communication issues made it impossible for him to perform his job. (*See* Doc. No. 1 at ¶¶ 14–16, 18–20, 22.) While we condemn the highly inappropriate behavior exhibited by Martin, we are constrained to find that it does not rise to the level of outrageous and egregious behavior required to support an IIED claim.

In his opposition brief, Schaffhouser compares his case to *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 308 (M.D. Pa. 1988). There, the plaintiff alleged that her supervisor sexually harassed her for several years, which included making statements about his sexual virility, his outings at strip joints, and the sexual performance of other employees. *Id.* Further, the plaintiff's supervisor inquired about her ability to have sexual relations after surgery, asked about her sexual performance, invited her to swim in the nude with him, and put his hands down his pants in front of her. *Id.* After the plaintiff rejected his advances, he assigned her burdensome tasks, followed her through the plant, and withheld information from her that she needed to perform her job. *Id.* The court denied the motion to dismiss the IIED claim, reasoning

that the conduct—highly offensive sexual harassment coupled with making the plaintiff's job impossible to perform after she rejected his advances—could "lead an average member of the community to exclaim, 'Outrageous!'" *Id.* at 311-12. Although Schaffhouser similarly alleges that Martin made his job impossible to perform, that is where the similarities end. We find that Martin's name-calling, criticizing, mocking, and ignoring Schaffhouser over a three-month period do not equate to the multi-year sexual harassment campaign at issue in *Bowersox*, nor would they make an average community member exclaim, "Outrageous!"

The other cases Schaffhouser cites similarly underscore the heightened level of atrocious behavior required to state an IIED claim and are distinguishable. *See Mascarini v. Quality Emp't Servs. & Training*, Civil Action No. 1:10-CV-1546, 2011 WL 332425, at *10 (M.D. Pa. Jan. 31, 2011) (denying motion to dismiss, where the first plaintiff alleged that her manager "threatened and harassed her on a daily basis, referred to her by use of inappropriate and derogatory names, threw tools at her and pounded on her desk," and "lunged at her, raised his hand, and stated 'I outta back-hand you off the fuckin dock,'" and the second plaintiff alleged racially-based and derogatory name-calling, "constant mocking of her slight accent," and being falsely accused of abusing one of the company's clients); *Jackson*, 2009 WL 229756, at *8, *10–11 (denying motion to dismiss and explaining that "the linchpin for the 'extreme and outrageous' element [was] the alleged [physical] assault" of the plaintiff); *Eubanks v. Wegmans Food Mkts.*, No. 4:CV 06-696, 2006 WL 2504099, at *1–3 (M.D. Pa. Aug. 28, 2006) (denying motion to dismiss where the plaintiff alleged (i) that a co-worker called him a "nigger," told him "I know how niggers are," and told him, with clear racially derogatory implications, "to stay in [his] place"; (ii) that he was wrongfully accused of having threatened that co-worker, resulting in him being suspended and then put on probation; and (iii) that he was retaliated against).

Because we find that Schaffhouser's allegations do not suffice to state a cognizable IIED claim, we grant Defendants' motion to dismiss Counts II and IV of the Complaint.

## IV. CONCLUSION

Schaffhouser's NIED and IIED claims fail because they are barred by the WCA. Dismissal is also warranted on Schaffhouser's IIED claims because the allegations do not rise to the level of extreme or outrageous conduct required to state an IIED claim. Accordingly, we grant Transedge's and Martin's motion to dismiss Counts II, III, and IV of the Complaint.

Dismissal of the IIED claims is without prejudice and with leave to amend the claims set forth in Counts II and IV only. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Counsel is advised that any amended complaint shall be consistent with this Memorandum.

An appropriate order follows.